DECISION
{¶ 1} Relator, Leon Campbell, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio, to vacate its order denying permanent total disability ("PTD") compensation and to issue an order that complies with State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203, and State ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167.
{¶ 2} This matter was referred to a magistrate of this court, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) No objections have been filed to that decision.
{¶ 3} As there have been no objections filed to the magistrate's decision, and it contains no error of law or other defect on its face, based on an independent review of the file, this court adopts the magistrate's decision. Relator's request for a writ of mandamus is denied.
Writ denied.
BRYANT and PETREE, JJ., concur.
 APPENDIX A IN MANDAMUS
{¶ 4} Relator, Leon Campbell, filed this original action in mandamus asking the court to issue a writ compelling respondent Industrial Commission of Ohio to vacate its order denying compensation for permanent total disability ("PTD") and to issue an order that complies with State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203, and State ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167.
Findings of Fact:
{¶ 5} Leon Campbell ("claimant") sustained several industrial injuries, including a 1986 crush injury to his left foot. In 1987, he sustained dorsal and lumbar strains and a bruised shoulder. In 1988, he suffered a bruised groin and inguinal hernia. The 1988 claim was also allowed for major depression. In 1990, claimant ceased working.
{¶ 6} In June 2001, claimant filed a PTD application, indicating that he was fifty-one years old, graduated from high school, could perform household chores and drive daily. His application was supported by medical reports from Bruce Siegel, D.O.
{¶ 7} In August 2001, Steven Wunder, M.D., concluded:
 Considering only the allowed conditions in his claims, Mr. Campbell would be capable of sustained remunerative employment. He would be capable of at least light job duties and tasks with lifting up to 20 pounds to 25 pounds on an occasional basis and lesser amounts of weight more frequently.
 His current disability appears to be due to the chronic morbid obesity and its sequelae as opposed to the work related injuries.
{¶ 8} In August 2001, claimant was examined by Lee Howard, Ph.D., who administered tests of personality and intelligence. Dr. Howard reported that claimant skipped much of the I.Q. test, declining to attempt any answer on about half the questions, but that he nonetheless scored 83, which was within the normal range. The MMPI-2 results were invalid, however. Dr. Howard ruled out a misunderstanding of the questions because claimant reported being able to read at the fifth/sixth grade level, which was sufficient for the questions, and, in addition, the I.Q. test indicated that claimant could understand the MMPI questions. Further, the MMPI was reviewed with claimant before he took it. According to Dr. Howard, the MMPI answers suggested "a paranoid schizophrenic disorder and/or a blatantly psychotic type of disorder," which was not observed in the interview and which is "often seen in individuals that are making a blatant and unsophisticated attempt at simulating mental illness." Dr. Howard set forth conclusions including the following:
 The claimant's high level of subjective complaints are not validated on objective psychometric testing.
* * *
 Even in the presence of only answering approximately one half of the items, he still obtains an IQ score of 83. If we apply previous research on underperformance on IQ testing [footnote omitted], we have an anticipated IQ score of 98. Thus, we have a minimum IQ score of 83 and a maximum IQ score of 98 which is someone within the low normal to normal range of intellectual functioning.
 This is consistent with someone that can perform at the simple to moderate task range, can be trained for sedentary employment, and can be re-trained through a technical school and/or two year college curriculum.
 In other words, this individual does have the intellectual ability to perform multiple work activities if so motivated.
 Current inability to work is not attributa[ble] to the industrial accident in question.
* * *
 This individual can perform at the simple, moderate, and low complex task range. This individual can perform at the low, moderate, and moderately high stress range.
 * * * An inability to return to work is not caused by [the] psychological condition. It would be caused by motivational factors, attitudinal factors, and/or physical conditions. (Emphasis omitted.)
{¶ 9} In September 2001, claimant was examined by James Lutz, M.D., who found that claimant could perform sedentary employment. Dr. Lutz noted that, aside from the allowed conditions, there were other disability factors including claimant's age, education, years out of the labor force, and morbid obesity.
{¶ 10} In September 2001, Norman Berg, Ph.D., reported that the allowed condition did not prevent claimant from performing sustained remunerative employment except that claimant could not return to his former job/employer.
{¶ 11} In October 2001, Dr. Siegel stated among other things that claimant's obesity resulted from his allowed conditions.
{¶ 12} A vocational assessment was provided by Brett Salkins.
{¶ 13} In October 2001, Darrin Elkins, a licensed counselor, and Jennifer Stoeckel, Ph.D., provided a critique of Dr. Howard's report. They assessed 25% impairment and recommended continued treatment.
{¶ 14} An independent vocational evaluation was performed by Mary Kolks based on claim-file documents provided by the commission. In a report rendered on November 19, 2001, Ms. Kolks concluded that claimant's age, education, past work, and reported ability to read, write and do basic math were consistent with an ability to develop skills necessary to perform entry-level sedentary or light work. Under the heading "tested aptitudes," Ms Kolks noted that Dr. Howard found an I.Q. score of 83.
{¶ 15} In her report, Ms. Kolks identified the documents from the claim file that she reviewed in rendering her opinion. Of the six psychological/psychiatric reports she reviewed, two were from Dr. Stoeckel, submitted in March 2000 and October 2000.
{¶ 16} In regard to additional issues, Ms. Kolks noted that claimant had a history of myocardial infarction. She also noted that Dr. Stoeckel reported claimant's description of being in special education in high school and being a poor student. Ms. Kolks opined that further evaluation might be needed to form a more accurate assessment of aptitudes but concluded that, "Still, he would have the capacity to perform entry-level unskilled, and possibly semiskilled work activity." In addition, Ms. Kolks opined that there were jobs that claimant could perform, based on the restrictions in the various medical reports.
{¶ 17} In the meantime, Dr. Stoeckel met with claimant again and tested his I.Q., academic achievement, and aptitudes. In a report filed with the Bureau of Workers' Compensation on November 14, 2001, she set forth scores including an I.Q. of 62.
{¶ 18} In January 2002, the PTD application was denied:
 This order is based on the medical reports of Dr. Lutz, Dr. Wunder and Dr. Howard and the vocational report of Ms. Kolks.
 * * * Dr. Lutz opined that the claimant is capable of performing physical work activity at a sedentary level.
 * * * Dr. Wunder opined that the claimant is capable of performing sustained remunerative employment considering the allowed conditions in the claims. Specifically, Dr. Wunder opined that the claimant would be capable of performing light duty jobs and tasks with lifting up to twenty to twenty-five pounds on an occasional basis and lesser amounts of weight more frequently.
 * * * Dr. Howard opined that the claimant is capable of performing employment considering the allowed psychological condition in the claim. Dr. Howard further opined that the claimant may have motivational or attitudinal factors which would impact on his ability to return to work, which are unrelated to these industrial injuries. Dr. Howard further opined that the claimant is not limited in his ability to perform employment considering the allowed psychological condition.
 * * * The Staff Hearing Officer further finds that the claimant is capable of performing sedentary employment within the restrictions which define such employment. Specifically, the Staff Hearing Officer finds that the claimant can perform work exerting up to ten pounds of force occasionally and a negligible amount of force frequently. The claimant can also sit throughout most of [the] day but walk or stand for brief periods of time. The Staff Hearing Officer further finds * * * no restrictions as a result of the allowed psychological condition which would impact on his reemployment.
 * * * Ms. Kolks noted the I.Q. testing performed by Dr. Howard which resulted in a score of 83. Ms. Kolks opined such I.Q. is consistent with the ability to perform simple to moderate tasks in certain types of sedentary employment as well as the ability to be re-trained.
 The Staff Hearing Officer finds that the claimant is 51 years old, has a high school education and work experience as a machine feeder and lapper. The Staff Hearing Officer finds that the claimant's age would not prevent him from adapting to new work rules, processes, methods, procedures, and tools involved in a new occupation. The Staff Hearing Officer further finds that the claimant's high school education may not accurately reflect his academic functioning. Dr. Stoeckel performed academic testing on the claimant at his request and reported that he reads, spells and performs arithmetic at a 3rd grade equivalent. Dr. Howard performed IQ testing and reported that despite the claimant's failure to answer all of the questions posed, he obtained an IQ score of 83. Dr. Howard opined that this IQ rating is consistent with someone that can perform at the simple to moderate task range and be retrained at least at a technical school level. Based on Dr. Howard's opinion, the Staff Hearing Officer finds that the claimant would be capable of participating in programs aimed at acquiring new skills. The Staff Hearing Officer further finds that the claimant's education would be sufficient in enabling the claimant to obtain and develop job skills through on-the-job training. The Staff Hearing Officer further finds that the claimant's work history was performed in the unskilled level at medium to heavy strengths. The Staff Hearing Officer finds such work experience did not provide him with transferable work skills to other occupations. However, the Staff Hearing Officer finds that the claimant is able to access unskilled, entry level occupations. Considering the claimant's age, education and work experience in conjunction with the limitations and capabilities associated with the allowed conditions, the Staff Hearing Officer finds that the claimant is able to perform the occupations identified in the vocational report of Ms. Kolks, such as: lock assembler, surveillance system monitor, and oil-seal assembler. Accordingly, the claimant's Application for Permanent and Total Disability Compensation is denied.
Conclusions of Law:
{¶ 19} Claimant contends that the industrial commission abused its discretion in denying PTD compensation. First, claimant argues that the commission failed to discuss information in the reports of Dr. Siegel and Dr. Stoeckel. Second, claimant argues that the commission had a duty to discuss, as a Stephenson factor, his morbid obesity. Third, claimant argues that the commission could not rely on Ms. Kolks' report because she failed to discuss the I.Q. score obtained by Dr. Stoeckel in November 2001.
{¶ 20} In a PTD determination, the issue before the commission is claimant's ability to do any sustained remunerative employment. State ex rel. Domjancic v. Indus. Comm. (1994), 69 Ohio St.3d 693. In making this determination, the commission first determines the claimant's medical/functional capacity based on the allowed conditions, and, if there is a residual medical capacity for work, then considers nonmedical factors. State ex rel. Speelman v. Indus. Comm. (1992), 73 Ohio App.3d 757.
{¶ 21} It is well settled that an award of compensation may not be based, even in part, on a nonallowed medical condition. E.g., State ex rel. Erico Products, Inc. v. Indus. Comm. (1994), 70 Ohio St.3d 661. However, the existence of a disabling nonallowed condition does not preclude an award of PTD compensation. The question is whether the allowed conditions in and of themselves support PTD, independent of the nonallowed condition. State ex rel. Quarto Mining Co. v. Foreman (1997), 79 Ohio St.3d 78; Byrd v. Am. Std., Inc. (1997), 78 Ohio St.3d 504. Accordingly, the commission abuses its discretion when it relies on a medical report based even in part on a nonallowed medical condition. State ex rel. Shields v. Indus. Comm. (1996), 74 Ohio St.3d 264, 268.
{¶ 22} However, medical capacity is not dispositive. Even where a claimant has a residual medical capacity to perform work activities, vocational factors may foreclose employment. Under Stephenson, supra, the commission considers the claimant's age, education, work record and other relevant factors. However, in its evaluation of Stephenson factors, the commission may not consider a disabling medical condition that is not allowed in the claim. State ex rel. Whetstone v. Bonded Oil Co. (1995), 73 Ohio St.3d 205.
{¶ 23} In addition, under Noll, supra, the commission must specify the evidence relied upon and briefly explain its reasoning. The commission is required to identify only the evidence on which it relied and has no duty to mention any other evidence or explain why it rejected the other evidence. See, e.g., State ex rel. Bell v. Indus. Comm. (1995), 72 Ohio St.3d 575; State ex rel. Lovell v. Indus. Comm. (1996),74 Ohio St.3d 250.
{¶ 24} In regard to the first issue, claimant argues that the commission had a duty to discuss the reports of Drs. Siegel and Stoeckel, on which it did not rely. This argument lacks merit. As stated above, the commission has no duty to discuss evidence and opinions it has rejected.
{¶ 25} Nonetheless, claimant argues that Dr. Stoeckel's I.Q. testing constituted evidence so crucial that the commission was required as a matter of law to discuss it. The magistrate disagrees, finding no reason to create an exception to the usual rule that the commission need not identify evidence it has rejected.
{¶ 26} Dr. Stoeckel's testing did not yield conclusive facts that the commission was required to accept. On such tests, a subject may lower his scores unconsciously or consciously where substantial gain is involved. Also, individuals may perform poorly on a "pen and pencil" test but perform far better in a "hands on" work setting. See, e.g., State ex rel. Scott v. Indus. Comm. (2002), Franklin App. No. 01AP-822, 2002-Ohio-2240, Appendix at A-7 to A-8.
{¶ 27} This observation does not mean that tests of intelligence and academic achievement cannot constitute valuable evidence on which the commission may rely. Rather, the point is only that a low score on such tests does not provide a conclusive assessment of the matter being tested. Id. In other words, the commission did not have a legal duty to rely on the I.Q. scores set forth in Dr. Stoeckel's report.
{¶ 28} In its order, the commission relied on the opinion of Dr. Howard, who administered various tests. The commission had discretion to rely on his I.Q. results and to find Dr. Stoeckel's unpersuasive. The claimant cited Dr. Stoeckel's academic testing insofar as it accepted that claimant's high school diploma did not necessarily reflect twelfth-grade abilities, a finding that was also within its discretion. In sum, the commission cited some evidence to supports its findings regarding claimant's mental and emotional capacities, and it did not abuse its discretion in omitting discussion of I.Q. results obtained by Dr. Stoeckel.
{¶ 29} Under the same legal principles, the commission had no duty to discuss the opinion of claimant's physician, Dr. Siegel. The commission stated its reliance on the medical opinions of Drs. Lutz and Wunder, which constituted some evidence on which the commission could rely and which satisfied its duty under Noll.
{¶ 30} The third issue involves the commission's reliance on the vocational opinion of Ms. Kolks, who noted the I.Q. score reported by Dr. Howard but not the score reported by Dr. Stoeckel. The magistrate finds no fatal defect.
{¶ 31} The reason Ms. Kolks did not report the testing scores obtained by Dr. Stoeckel is evident on the face of the record. At the time she prepared her report, Ms. Kolks did not have the Stoeckel report of November 2001 for review. In her report, Ms. Kolks listed six psychological/psychiatric reports in the file — including two from Dr. Stoeckel — that she reviewed in preparing her assessment. Ms. Kolks did not list Dr. Stoeckel's additional report of November 2001, but there is no evidence to establish that Ms. Kolks had that additional report in her possession while preparing her assessment, or that she should have had it. The record does not reflect that Dr. Stoeckel's report (which was filed with the bureau on November 14, 2001) was in the claim file when documents were pulled for Ms. Kolks' review. Given that Ms. Kolks issued her report on November 19, 2002, and that the commission necessarily provided documents to her in advance of that date, the magistrate finds that claimant has not established in mandamus that Ms. Kolks' report is defective as a matter of law because she did not mention an additional report filed on November 14, 2001.
{¶ 32} The administrative code sets forth deadlines for submitting evidence and states that, after medical reports are received from the commission's specialists, the commission sends file materials to its independent vocational expert. Ohio Adm. Code 4121-3-34(C)(6). The code further states that, at the time the commission refers the file to its vocational expert, it notifies the parties that they have 45 days to submit any additional vocational information to the commission. Ohio Adm. Code 4121-3-34(C)(6)(c). The code indicates that, if a party files additional information within the 45-day period, the commission must consider it, but the code does not require the commission to send additional evidence to its vocational expert.
{¶ 33} The code puts parties on notice of when the file materials will be provided to the independent expert, and there is no proof in this action that claimant's expert was unable to provide earlier testing. In short, the magistrate finds no duty on the part of the commission to provide Dr. Stoeckel's additional report to Ms. Kolks.
{¶ 34} In its order, the commission repeatedly chose to rely on Dr. Howard's assessments rather than on Dr. Stoeckel's. In the absence of evidence demonstrating that the commission failed to give reasonable consideration to Dr. Stoeckel's reports, the magistrate finds no abuse of discretion.
{¶ 35} Next, claimant raises an issue regarding his morbid obesity. Claimant asserts that he gained 150 pounds following his 1988 injury and contends that, because his industrial injury caused the obesity, the commission had a duty to consider it as a disability factor under Stephenson, supra. The parties cite no decisions addressing the issue of whether the commission has a duty to consider obesity as a Stephenson factor.
{¶ 36} The magistrate concludes that, for the commission to consider functional impairment caused by obesity in its determination of PTD, the condition of obesity must be allowed in the claim. In addition, the magistrate concludes that consideration of medical/functional impairment from obesity belongs in the discussion of the medical factors, not in the discussion of Stephenson factors. Last, the magistrate notes that the factual issue of whether the claimant's obesity is injury-related has not been determined or even addressed by the commission, and that the court lacks jurisdiction in mandamus to determine — or review a determination of — whether the evidence proved that claimant's obesity resulted from the allowed conditions. In reaching these conclusions, the magistrate relied on the following principles.
{¶ 37} First, obesity is a medical condition of the body. See, e.g., Byrd, supra Medical experts agree that obesity puts stress and strain on the lower extremities, spinal joints and muscles, and the heart, lungs, etc. See, generally, id.; State ex rel. Bond v. Velotta Co. (2001), 91 Ohio St.3d 418; Johnson v. Secretary of Health Human Serv. (6th Cir. 1986), 794 F.2d 1106 (based on federal regulations but reviewing basic principles regarding obesity); State ex rel. Eldridge v. Indus. Comm. (1988), 35 Ohio St.3d 189. Regardless of its cause, extreme obesity tends to result in functional limitations imposed not only by the weight itself but also by disturbance of other body systems. See Johnson.
{¶ 38} Second, as a medical condition, obesity is unique in that it is an overall condition of the body rather than a condition of a particular part or organ. State ex rel. Miller v. Indus. Comm. (1994),71 Ohio St.3d 229.
{¶ 39} Third, where an allowed condition of the back can be improved through weight reduction, the commission may approve a weight-loss program to treat the allowed condition, regardless of the cause of obesity. Miller, supra; State ex rel. Williams v. Cincinnati Country Club (1998), 83 Ohio St.3d 284.
{¶ 40} Fourth, a medical recommendation that a claimant needs to participate in a weight-loss program may or may not be consistent with attainment of maximum medical improvement. E.g., Williams, Miller. However, no issues regarding temporary total compensation are presented in this action.
{¶ 41} Fifth, a feature of obesity that complicates a disability analysis is that multiple factors can cause obesity, and some of the factors are voluntary. That is, obesity is often the result of personal choices. However, while obesity has voluntary aspects in many or most cases, it cannot be said as a matter of law that obesity is always voluntary. There are medical conditions such as hypothyroidism that can cause a person to gain excessive weight. See, generally, Taber's Cyclopedic Medical Dictionary (18th Ed. 1997), at 952 ("hypothyroidism"); id. at 1330-1331 ("obesity"); Johnson, supra (concluding that obesity is not per se remediable); Miller, supra (stating that the issue of eligibility for weight-loss treatment is complex for reasons involving causal relationships); United States v. Zwick (N.D.Ohio.), 413 F. Supp. 113, 115 (noting that obesity may involve a complex interplay between physiological and behavioral factors).
{¶ 42} In the context of industrial injury, a reasonable person could conclude that, when a formerly active person sustains an injury requiring bed-rest or a sedentary lifestyle, a weight gain of some extent is reasonable to expect as a result of the enforced inactivity. At some point, however, continued weight gain may be a matter of personal choices and lifestyle. Even where a claimant cannot exercise vigorously or at length, he can reduce his intake of calories in many cases. In other words, it is fair to conclude that there if often an element of choice involved with the condition of obesity. It is also fair to conclude that the question of the voluntariness of obesity is a factual issue to be determined by the finder of fact upon medical evidence. In sum, the cause of obesity in particular cases is a factual matter to be decided by the finder of fact upon medical evidence. See, generally, Zavatsky v. Stringer (1978), 56 Ohio St.2d 386 (noting that the question of causation is for the finder of fact, and that the matter of whether obesity should have been allowed in a claim was appealable to the common pleas court); Karavolos v. Brown Derby (1999), 99 Ohio App.3d 548 (where a claimant alleged that his substance abuse was caused by his allowed industrial condition, the causation question was for the finder of fact to determine upon medical evidence).
{¶ 43} In the present action, claimant has argued that the commission simply never allows the condition of obesity in workers' compensation claims, as a matter of policy. Claimant offers no proof of the alleged policy, however, nor does he show that the commission has refused to allow obesity in his claim.
{¶ 44} Furthermore, even if a request to allow obesity were arbitrarily denied, the way to challenge the decision would be to file a statutory appeal to the court of common pleas, not to ask the court in mandamus to find that obesity was caused by the industrial injury. In mandamus, the court does not resolve or review the issue of whether the evidence established that a particular medical condition was caused by the industrial accident. E.g., Zavatsky, supra, 391, 400-401. The court explained in Zavatsky that a claimant with an allowed low back injury may later claim that he has developed a heart condition, a psychoneurosis, ulcers, or other condition due to the back injury and that R.C. 4123.84
specifically recognizes the claimant's right to make such a claim. However, the court held that an administrative decision regarding whether a condition developed as a result of an allowed condition was appealable to the common pleas court.
{¶ 45} In reaching this conclusion, the court discussed Mooney v. Stringer (1976), 48 Ohio St.2d 375, in which the commission had disallowed obesity. The court noted that, in Mooney, a stipulation in the trial court had eliminated the only issues that were appealable to the trial court — whether obesity and other conditions "were related to the injury." Zavatsky, at 400-402. The magistrate concludes that the question of whether obesity was caused by the allowed conditions or treatment for the allowed conditions is for the commission to decide pursuant to an allowance hearing, with a right of appeal to the common pleas court. It is not a question for the commission to decide in a PTD hearing with review in mandamus.
{¶ 46} Next, the magistrate notes that there are no specific issues under R.C. 4123.84 in the present action because the commission did not rely on the statute of limitations in declining to award PTD based in part on claimant's obesity. However, the courts, in considering whether a residual condition is barred under R.C. 4123.84, have discussed the nature of residual conditions in general, and those decisions provide guidance. In addition, there are decisions holding that the commission may consider a medical problem that is not allowed in the claim, where the medical problem is a symptom of the allowed condition or a complication of treatment for an allowed condition.
{¶ 47} First, although the commission may not award PTD based on a nonallowed condition, there are circumstances where the commission (or a reporting physician) may consider, as part of a disability evaluation, a medical problem not allowed in the claim. In State ex rel. Meridia Hillcrest Hosp. v. Indus. Comm. (1995), 74 Ohio St.3d 39, the Ohio Supreme Court cautioned against an artificial classification of medical problems as "symptoms" of the allowed conditions versus "residual conditions" or "additional conditions." Accepting that caution, the magistrate nonetheless notes that some medical sequelae need not be explicitly allowed in order for the commission to consider them in awarding benefits. See, e.g., State ex rel. Wallace v. Indus. Comm. (1979), 57 Ohio St.2d 55, 61 (where the claimant's hand and upper extremity were scarred and extremely sensitive after numerous surgeries for allowed conditions, the commission could consider the phenomenon of "reflex dystrophy" although it was not an allowed condition); State ex rel. International Harvester Co. v. Indus. Comm. (1974), 43 Ohio St.2d 40
(permitting, in claim allowed for lumbosacral strain, consideration of radiculopathy and nerve root compromise).
{¶ 48} However, when a medical problem is not implicitly encompassed as an aspect of the allowed conditions, the commission may not grant benefits based on that medical problem unless it is allowed as a condition in the claim. See, e.g., Meridia Hillcrest, supra; State ex rel. Bays v. Portsmouth Casting, Inc. (1986), Franklin App. No. 85AP-921. In sum, when evaluating for disability purposes, neither the commission nor a reporting physician may properly consider a residual condition such as depression, ulcers, drug dependency, or obesity until and unless the condition is allowed in the claim. See, generally, Shields, Byrd, Zavatsky, Bays, Karavalos, supra; State ex rel. Vernon Gibson v. Indus. Comm. (1998), 82 Ohio St.3d 293 (affirming denial of writ where administrative order had labeled claimant's obesity and cardiac conditions as "nonallowed" conditions); State ex rel. Vernon Gibson v. Indus. Comm. (1993), Franklin App. No. 93AP-127 (describing evidence on which commission had relied, including a medical opinion that claimant could voluntarily reduce his morbid obesity, and noting that the Ohio Supreme Court had rejected the argument that a nonallowed physical problem could be considered in a PTD determination as a Stephenson factor); State ex rel. Bonzi v. LTV Steel (1991), Franklin App. No. 89AP-1319 (where claimant sustained injuries to the knee and back, but a medical report stated claimant could return to work if she were not obese, the court found that the report constituted some evidence to support a finding that there was no medical impairment caused by industrial injury, but, instead, all of the medical impairment was a result of obesity); State ex rel. Starr v. Firestone Tire Rubber Co. (1989), Franklin App. No. 87AP-807 (finding no abuse of discretion where commission order indicated that claimant's disability resulted from nonallowed conditions including obesity).
{¶ 49} As to whether, in the present action, the claimant's obesity was caused by the allowed conditions, the magistrate reiterates that the issue is not reviewable in mandamus. The magistrate recognizes that, in Miller, the Ohio Supreme Court stated that the "mechanics" of former R.C. 4123.84 are "irreconcilable with the concept of obesity as an allowed condition" because obesity is not a condition of a specific part of the body. However, the court did not appear to foreclose the possibility of obesity as an allowed condition. Rather, the court stated that, when a claimant is already overweight when injured, he or she "generally cannot maintain the requisite causal relationship for an additional allowance" for obesity, which suggests that, in other circumstances, the requisite causal relationship could be established. For example, there could be a causal relationship between obesity and an industrial injury where an allowed physical condition severely limited exercise and where an allowed psychological condition involved overeating as a symptom or involved a severe loss of motivation.
{¶ 50} In the present PTD consideration, however, the commission had no duty to consider whether claimant's obesity was caused by the allowed conditions. Likewise, because obesity was not an allowed condition, the commission was prohibited from relying on any medical opinion based on obesity.
{¶ 51} Last, the magistrate rejects the proposition that the commission was required to consider the effect of injury-caused obesity as a Stephenson factor. See, Whetstone, supra. Morbid obesity is a condition of the body that affect a person's medical/functional capacity. Consideration of obesity belongs in the discussion of medical impairment, not in the discussion of Stephenson factors.
{¶ 52} The magistrate concludes that claimant has not demonstrated an abuse of discretion and that this court should deny the requested writ.